**DEL MAR ENGINEERING
LABORATORIES**

v.

**The UNITED STATES.**

**No. 27–71.**

United States Court of Claims.

Oct. 22, 1975.

J. B. McGuire, Los Angeles, Cal., attorney of record, for plaintiff.

Donald E. Townsend, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, for defendant.

Before COWEN, Chief Judge, and DAVIS and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed June 13, 1975, moving that the court adopt as the basis for its judgment in this case the recommended decision of Trial Judge Hal D. Cooper, filed April 28, 1975, pursuant to Rule 134(h) since plaintiff has failed to file a timely notice of intention to except thereto. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

COOPER, Trial Judge:

Plaintiff, under 28 U.S.C. § 1498, seeks reasonable and entire compensation for the alleged unauthorized use and manufacture by or for the United States of an invention described in claims 1 to 7, inclusive, of United States Letters Patent No. 2,869,120, entitled "Tow Target Having Combustion Signal Means."

The invention delineated in the patent was developed in response to the Air Force's need for a suitable target to test the effectiveness of its then-new heat-seeking missiles. Specifically, the invention relates to an aerodynamically stable structure which is towed behind a tractor aircraft and used to simulate a self-propelled aerial object such as a jet aircraft. When used in this manner, it provides for inexpensive, yet realistic practice for the military in the detection, tracking, and interception of such aircraft by the use of automatic and semiautomatic fire and missile control systems. The target is particularly designed to be carried aloft by a tow plane, released and towed at a considerable distance behind the plane, and recovered by the tow plane before landing, if it has not been destroyed by the missiles fired at it.

The preferred embodiment of the patented device comprises a streamlined target structure having a body of low-drag aerodynamic configuration formed from a hollow, thin-walled, radar-permeable, rigid material, a corner radar reflector incorporated within the body of the tow target, and a plurality of rearwardly directed flares mounted to the trailing end of the tow target body. The flares are used to simulate representative infrared (IR) emissions characteristic of jet aircraft. Carried within the body are a radio receiver and battery to develop an output signal in response to a signal received from a remote signal generating source to actuate ignitors electrically connected to the battery for igniting the flares. A plurality of fins of a nonmetallic material are carried by the trailing portion of the body member for stabilizing the target in towed flight, and elements are embedded within these fins to form an antenna for the radio receiver. Canted tabs on the fins cause the target to rotate as it is towed. The patent teaches that the flares may, by means of a sequencing switch, be ignited in succession or at selected stages, depending on their purpose. Usually, the invention provides for timing the combustion period by remote control to occur at a critical or controlling stage in a countermeasure procedure.

To prevent accidental or inadvertent ignition of the flares, a built-in safety system is provided which includes a normally closed switch that is maintained in an open position by a safety pin when the tow target is on the ground. The normally closed switch opens automatically whenever the tow target is stored or snubbed on the towing aircraft and closes automatically to complete the ignitor circuit when released from the plane.

■ As in most patent cases, the basic thrust of the defense is the contention that the claims in issue are invalid. In this case, the invalidity defense is based on 35 U.S.C. § 102(a) and (g) and § 103 (1964). For the reasons stated hereinafter, the § 102(g) defense is a sound one as to claims 1, 3, and 4 and defendant has carried its burden with respect to the § 103 defense as to all of claims 1–7.

Addressing first the § 103 defense, a determination of whether the subject matter of a patent is obvious, though ultimately a question of law, necessarily involves the following three-tiered factual determination:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. * * * [*Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).]

The subject matter of the claims in suit was conceived in April 1956. Prior to that time, it was well known that aircraft could be simulated for purposes of rocketry or gunnery practice by use of aerodynamically stable targets towed behind manned tractor aircraft. The Hopper patents, 3,137,852 and 3,128,463, assigned to plaintiff, disclose a streamlined, nose-towed, tow target with radar

reflectors carried on board to provide a target for radar-directed weaponry. The state of the prior art existing at this time is further illustrated by plaintiff's own RADop series of tow targets which were offered for sale to the Air Force in July 1955 and which are of the same basic design as that shown in the Hopper patents. These targets were lightweight, streamlined, radar-permeable, spin-stabilized hollow members of aerodynamically stable configuration which were carried aloft by tow aircraft and streamed on a towline behind the tow plane a suitable distance for gunnery, rocketry, or missile practice. They could be recovered in some cases by being reeled into the tow plane and in others by being parachuted to the ground.

Although the RADop target did not contain any type of electrical control or power system thereon, it was well known prior to 1956 that tow targets could be equipped with radio-link receivers to actuate various devices carried by the target. Plaintiff's DELta tow targets, for example, though of much more complex configuration than the RADop, carried a variety of equipment such as batteries, radios, radar and visual augmentation devices, smoke markers, parachutes, radar corner devices, and the like. The use of a radio link to a target had also been used, prior to 1956, with drones, which were pilotless radio-controlled aircraft. For purposes of tracking and photographing the drone during missile firings, drone targets had been equipped with radio-actuated flares as early as 1954. Of course, the fact that flares are a source of IR emission was notoriously well known.

With respect to the use of safety switches, it was known long prior to 1956 to use various types and kinds of safety switches to disarm ordnance to prevent its accidental detonation during handling and transportation. Typically, these switches were effective to arm the ordnance only after it had been released from the airplane.

Based on the foregoing prior art, the differences between that prior art and the claims in suit (the second factual determination required by *Graham*) lie in two areas: as to claims 1 through 4,[1] the differences reside primarily in the selection and use of radio-actuated flares on a specific kind of towed target; as to claims 5 through 7,[2] an additional aspect is the use of a safety means to prevent premature ignition of the flares on the towed target.

Based on these differences, and with particular reference to claim 1, the question is whether it would have been obvious in 1956 to one of ordinary skill to employ radio-actuated flares on a target such as those disclosed in the Hopper patents. It is concluded that this question must be answered affirmatively. It is to be noted that the combination

1. Claim 1 is representative of claims 1–4 and is as follows:

"1. An aerial tow target comprising a hollow thin-walled rigid body member having a low drag aerodynamic configuration, the walls of said body member being formed of a nonmetallic material permeable by radar waves; means defining a plurality of normally intersecting planes interiorly of said body member and having a metallic surface for reflecting exteriorly propagated radar waves; a rearwardly directed flare magazine mounted to the trailing end of said body member; a plurality of rearwardly directed flares mounted in said magazine; a radio receiver carried within said body member, said radio receiver developing an output signal in response to a received signal from a remote source; and means for igniting said flares in sequence, including means responsive to said output signal of the radio receiver, whereby said flares are ignited in response to the received signal from the remote source."

2. Claim 5 is representative and is as follows:

"5. An aerial tow target for practice in the detection of self-propelled aerial objects, comprising: a streamlined body for connection to a tow cable; at least one charge of rapidly combustible material carried by said body to create a highly visible flame; remotely controlled ignition means on said body to ignite said charge; means for supporting said body on an aircraft for transportation to a practice area; and safety means to make said ignition means inoperative in response to engagement of the body by said supporting means."

defined by claim 1 is simply plaintiff's own prior RADop target with radio-actuated flares added to it. As pointed out previously, the use of radio-actuated flares was known to those in the field of aerial targets, having been used as visual aids for tracking and photographing of targets such as drones. Merely adding this known feature to the RADop target does not appear to be at all unobvious. In this regard, it is of course, the fact that the flares on plaintiff's targets are used principally as an IR source while the prior art use of flares mentioned previously was for a different purpose; however, claim 1 is not limited in terms of the use to which the flares are put and is as readily read on a target with signal flares as on one with flares used as an IR source. Indeed, the patent recognizes visual identification as one of the purposes for which the flares may be used. (Col. 1, lines 22–37.) Hence, a distinction based on the purpose or use of the flares cannot be relied upon to preserve the validity of the claim.

Two other factors support this conclusion of obviousness. The first is the work in 1955–56 at the Naval Ordnance Test Station where a target, designated the Dart, was developed. That target utilized flares as an IR source and a radio control and sequencing switch to actuate them. Defendant argues that this work should serve as an anticipation under 35 U.S.C. § 102(a). Plaintiff, on the other hand, urges that the classified nature of this work prevented it from being "public" and hence it is not a bar within the meaning of the statute.

■ It is clear from the evidence that the Dart project was classified in April 1955. Although defendant did present some evidence which would indicate that there was unclassified work on the Dart prior to that time, that evidence consists largely of the oral testimony of one wit-

ness. Of all the documentary evidence submitted by defendant in support of this testimony, the only documents that discuss equipping the Dart with flares were post-April 1955 and were classified. On balance, it is concluded that, although defendant has established that the Dart development did occur prior to that of the patentees', defendant has not sustained its burden in establishing a prior public use under 35 U.S.C. § 102(a).[3] *Soundscriber Corp. v. United States,* 360 F.2d 954, 175 Ct.Cl. 644 (1966); *Meurer Steel Barrel Co. v. United States,* 74 Ct.Cl. 428 (1932). Moreover, classified documents whose security classification was not removed until after the invention of the patent in suit are not prior publications or evidence of prior knowledge as they are not "public" within the meaning of § 102(a). *Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc.,* 298 F.2d 36, 38 (7th Cir. 1961). Nor are the above principles altered merely because the patentees had a security clearance where, as here, there is no evidence of actual knowledge by the patentees of that prior secret work. *Whitcomb v. American Airlines, Inc.,* 164 USPQ 610, 611 (E.D.Va.1968), *rev'd on other grounds, sub nom. General Dynamics Corp. v. Whitecomb,* 443 F.2d 630 (4th Cir. 1971) *cert. denied,* 404 U.S. 1016, 92 S.Ct. 676, 30 L.Ed.2d 664 (1972); *cf. Ex Parte Stalego,* 154 USPQ 52 (P.O.Bd. App.1966). The mere fact an individual has a security clearance does not justify the conclusion that he had, or could have had, access to specific secret information. Thus, plaintiff is correct that the Dart work is not a bar under 35 U.S.C. § 102(a).

■ Nonetheless, the classified documents, and the work on which they are based, do supply probative evidence on the issue of what the general level of

---

**3.** Plaintiff's additional contention that the Dart work was abandoned and is therefore not available as prior art cannot be sustained since it is clear from the evidence that the Dart was successfully reduced to practice prior to the invention of the patent in suit. Its subsequent abandonment in 1957 is irrelevant. *Connecticut Valley Enterprises v. United States,* 348 F.2d 949, 172 Ct.Cl. 468 (1965).

skill in the art was at the time the instant invention was made. *Simmonds Precision Products, Inc. v. United States,* 153 USPQ 465, 468 (Trial Div.Ct.Cl.1967). Also see *International Glass Co. v. United States,* 187 Ct.Cl. 376, 408 F.2d 395 (1969); *Servo Corporation of America v. General Electric Co.,* 337 F.2d 716, 720 (4th Cir. 1964) *cert. denied,* 383 U.S. 934, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966). Further, even though it is not prior art, the work reflected in these documents is some evidence of what those confronted with a similar problem in 1956 would have proposed as a solution to that problem. *Felburn v. New York Central R.R.,* 350 F.2d 416, 425–26 (6th Cir. 1965) *cert. denied,* 383 U.S. 935, 86 S.Ct. 1063, 15 L.Ed.2d 852 (1966). It is in the foregoing light, then, that the Dart target has been considered for purposes of evaluating the § 103 defense.

The Dart target consisted of a lightweight cruciform configuration designed to be towed behind an airplane. Corner reflectors for radar reflectivity were carried on the target. Although originally designed for gunnery, by sometime in 1955, rearwardly disposed flares, ignited sequentially by a battery-powered radio link receiver contained within the nose boom, were used on the Dart target to simulate representative IR emissions characteristic of jet aircraft. The Navy's experiments with the Dart, which included the successful firing of Sidewinder missiles at the flare-equipped target prior to April 1956, demonstrated that flares were an adequate source of IR emissions for purposes of testing air-to-air heat-seeking missiles.

It should also be noted that at about this same time, the Air Force was using flares as an IR source in classified stationary ground tests of heat-seeking missiles. Since this latter work was not "public," it is not available as prior art but it has been considered from the same point of view as the Dart.

The second factor providing some guidance as to the level of knowledge possessed by a person ordinarily skilled in the art is the evidence as to the Air Force Project DOLLAR–WISE brainstorming session, participated in by William Thornton, one of the inventors here, in the early part of 1955. During that session, Thornton was confronted with the problem of evolving a practical scheme that would reduce the cost of heat-seeking missile evaluation and testing and his proposal at that time was to use rearwardly disposed IR sources, possibly *flares,* in an aerodynamically stable tow target. While, again, the evidence regarding Thornton's suggestion does not necessarily establish either a prior invention [4] or a prior publication, it nonetheless has a bearing on the issue of what was obvious in 1956 when Thornton was again presented with substantially the same problem.

In sum, the prior use of radio-actuated flares on targets and the known fact that flares are IR emitters would suggest that there was nothing unobvious in selecting radio-actuated flares as the means for simulating IR emissions on a tow target. The evidence that the patentees and the Navy, both working independently, arrived at the same combination is confirmatory of this conclusion.

With respect to the use of a radio-controlled stepper switch for sequentially igniting the flares, this too had been done previously and was a known technique, although the prior art had done it principally with flares used for visual aids. However, as noted previously, the claims do not support any distinction based on the use to which the flares are put, so the obviousness of the technique for visual-aid purposes is fatal to a claim that is broad enough to cover flares used either for that purpose or another purpose. Moreover, the work on Dart utilized the very same approach, once again confirm-

---

**4.** Defendant argues that certain sketches produced by Thornton at this brainstorming session constitute a conception of the invention by an employee of the Government, thus bar-

ring this suit under 28 U.S.C. § 1498; however, this question need not be resolved in light of the conclusion reached under 35 U.S.C. § 103.

ing the apparent obviousness of the claimed combination.

Claims 3 and 4 are directed to the same combination as claim 1 and are considered to be obvious for the same reasons.

Claim 2 differs in substance from claim 1 only in that it specifies elements embedded within the tail fins of the target to form an antenna for the radio receiver. Neither party has placed any emphasis on this feature and it appears to be an obvious expedient. Plainly, the radio receiver requires an antenna and embedding it in the tail fin is one location where aerodynamic drag would be minimized.

■ The evidence regarding the Dart also is sufficient to invalidate claims 1, 3, and 4 under 35 U.S.C. § 102(g). Under this section, a prior invention, *i. e.*, one that has been reduced to practice and not abandoned, suppressed, or concealed, is sufficient even though it was not "public" at the time the patented invention was made. *International Glass Co. v. United States, supra.* Here, the evidence is sufficient to establish a reduction to practice of the Dart prior to plaintiff's date of conception, as the oral testimony of defendant's witnesses, and documentary evidence, establishes that flare-equipped, radio-actuated Dart targets were used for successful firing of Sidewinder missiles prior to April 1956.[5] *Corona Cord Tire Co. v. Dovan Chemical Corp.,* 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928); *National Latex Products Co. v. Sun Rubber Co.,* 274 F.2d 224 (6th Cir. 1959), *rehearing denied,* 276 F.2d 167 (1960), *cert. denied,* 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022. Thus, the only remaining issue is whether the Dart work was abandoned, suppressed, or concealed.

■ Quite clearly, the abandonment of work on the Dart in 1957 does not remove it as a prior invention against work in April 1956. *Cf. Connecticut Valley Enterprises v. United States,* 348 F.2d 949, 172 Ct.Cl. 468 (1965). The real question is whether, by reason of its classified status, the work must be deemed to have been suppressed or concealed, within the meaning of the statute.

The precept that each case involving the issue of suppression or concealment must be considered on its own particular set of facts is a sound one. *Young v. Dworkin,* 489 F.2d 1277 (CCPA 1974); *Myers v. Feigelman,* 455 F.2d 596 (CCPA 1972); *Engelhardt v. Judd,* 54 C.C.P.A. 865, 369 F.2d 408 (1966). There is no one set of circumstances, no one controlling fact that automatically establishes a suppression or concealment. In the final analysis, it is the effect of the particular facts on the primary purpose behind § 102(g), viz., the encouragement of public disclosure of new inventions, that is determinative. As it has been stated, in an interference context, the prior inventor who deliberately suppresses or conceals the knowledge of his invention * * * subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of "the true policy and ends of the patent laws," the latter is the first to invent, and therefore entitled to the reward. * * * [*Thomson v. Weston,* 19 App. D.C. 373, 381 (1902). Also, see, *Kendall v. Winsor,* 62 U.S. (21 How.) 322, 16 L.Ed. 165 (1858); *Mason v. Hepburn,* 13 App.D.C. 86 (1898); *Young v. Dworkin, supra.*[6]]

---

5. Compare, *Carboline Co. v. Mobil Oil Corp.,* 301 F.Supp. 141 (N.D.Ill.1969), wherein a 35 U.S.C. § 102(g) defense was unsuccessful because a prior completion and reduction to practice of the invention by another inventor,

whose work was under a security classification, was not adequately proved.

6. For comprehensive discussions of 35 U.S.C. § 102(g), see Oisher and Steinhauser, *The Role*

■ It is difficult to view the secrecy imposed on work by a security classification as being hostile to the public good. To the contrary, presumably it is for the public good, as perceived by those in responsible positions of government, that certain types and kinds of work are at one time or another placed in a classified status in which a security clearance is required before anyone is permitted to have access to it. But even then, it frequently is the case that the work itself is intended to be put into use for the public benefit. In other words, the classification restriction may not suppress the work itself, only access to that work. For example, a classified weapon may be manufactured in quantity and placed in the nation's arsenal of weapons, all for the benefit of the public, but yet be kept secret both from the public at large and those working in that same art. In such circumstances, is the Government, which imposed the secrecy order for the public good, obligated to pay compensation to a second inventor who, working independently and without knowledge of the classified article, makes the same invention, but at a later time? Because of considerations such as these, it is believed that the fact of security classification should not be regarded per se as a suppression and concealment; rather, it should be viewed as but one fact in the totality of particular facts applicable to the specific situation under consideration.

■ In this case, the evidence established that the information relating to Dart was accessible to at least some of those in the military having security clearances and a need to know. For example, documents in the record indicate that the Navy was keeping the Air Force advised of its Dart program, as well as related matters. Moreover, the Dart equipped with flares was built and actively tested with Sidewinder missiles, thereby demonstrating the feasibility of such a target. The targets subsequently procured by the military, notably those such as the TDU–9/B, are similar in configuration to the Dart and, of course, use the concept of radio-actuated flares. Targets of this type have been used over the years by the military for testing and training purposes. Thus, despite its classified nature, the work on the Dart was not suppressed, in the sense that the benefit thereof was withheld from the public. In the absence of any showing that defendant, by its security classification system, attempted to exclude the public from the benefit of this work, it is considered not to have been suppressed or concealed for purposes of 35 U.S.C. § 102(g). *Cf. Brush v. Condit*, 132 U.S. 39, 10 S.Ct. 1, 33 L.Ed. 251 (1889); *Rosaire v. Baroid Sales Div., National Lead Co.*, 218 F.2d 72 (5th Cir. 1955), *cert. denied*, 349 U.S. 916, 75 S.Ct. 605, 99 L.Ed. 1249.

Turning to claims 5 through 7, the same combination of a RADop target with radio-actuated flares is claimed, but these claims further include the limitation of a safety switch, which renders the ignitors for the flares inoperative when the target is supported on the towing aircraft. There is no prior art disclosing specifically the use of a safety switch in combination with a target; however, as noted previously, it was well known in the ordnance and armament field to use switches of this type to prevent accidental detonation or ignition. (See finding 7.) Indeed, almost without exception, the Navy requires such safety systems with all of its ordnance. Hence, merely adding a safety switch to prevent inadvertent ignition of the flares is considered to be an obvious expedient.

Claim 7 has added limitation of an insertable pin to hold open the safety switch when the target is on the ground and away from the airplane. Plaintiff has placed no reliance on this feature although the prior art asserted by de-

*of the Prior Inventor Under Section 102(g)*, 45 J.Pat.Off.Soc'y 595 (1963); Roch, *Prior Knowledge Compared with Prior Invention as a Statutory Bar*, 50 J.Pat.Off.Soc'y 409 (1968); Ro-

senstock, *Prior Art Under 35 U.S.C. Section 103 Includes Prior Invention—In Re Bass Et Al. and In Re Hellsund*, 56 J.Pat.Off.Soc'y 263 (1974).

fendant does not specifically disclose it. Ordnance of the type disclosed in the prior art, to the extent it requires a power source, relies on the batteries of the transporting airplane. As a result, it was generally unnecessary to provide a mechanism to prevent detonation of the ordnance when it was separated from the plane. On the other hand, plaintiff's target has a battery source on the target itself so it is always "armed" in the sense that the power to ignite the flares is present both when the target is supported on the plane and when it is separated from the plane. The safety switch, which is held open by the target support and is therefore effective to prevent ignition when the target is supported on the plane, is ineffective for that purpose when the target is, for example, being handled separately on the ground; thus, the need for an additional mechanism which would disarm the target when it is on the ground. Plaintiff solved this problem by providing a pin that could be manually inserted to hold the normally closed safety switch in an open position.

Considering the level of skill in the art, and in view of the well known need for safety switches and arming devices on all kinds of ordnance, it appears there was nothing unobvious in the safety-pin arrangement specified in claim 7.

■ In view of the conclusion on validity, it is unnecessary to reach the question of infringement, for an invalid patent cannot be infringed. *Felburn v. New York Central R.R., supra.* Nor is it necessary to consider any other of the multiple defenses asserted by defendant in this case.

Claims 1–7 being invalid, the petition must be dismissed.

### FINDINGS OF FACT

1. This suit seeks reasonable and entire compensation for the alleged unauthorized manufacture or use by or for the United States of the invention described in claims 1 to 7,[1] inclusive, of United States Letters Patent No. 2,869,120, for "Tow Target Having Combustion Signal Means," issued on January 13, 1959, on an application filed jointly by Orson B. Lolmaugh, William E. Thornton, and Charles A. Smith on September 17, 1956. Del Mar Engineering Laboratories, a corporation incorporated in the State of California, is the owner by assignment of the patent in suit.

2. (a) The patent discloses an aerial tow target for simulating self-propelled aerial objects such as jet aircraft for affording practice in detecting, tracking, and intercepting such objects. In use, automatic or semiautomatic equipment such as missiles are fired at these targets as they are towed behind a tractor aircraft. The target is particularly designed to be carried aloft by a tow plane, released and streamed well behind the plane, and recovered by the tow plane before landing, if the target has not been destroyed by a missile fired at it.

(b) A preferred embodiment of the patented device is illustrated in Figs. 1–4 and comprises a streamlined target structure having a low drag aerodynamic configuration formed from a hollow, thin-walled, rigid body, a corner radar reflector incorporated within the body of the tow target, and a plurality of rearwardly directed flares secured in a flare magazine mounted to the trailing end of the tow target body. Carried within the body are a radio receiver and battery to develop an output signal in response to a signal received from a remote signal-generating source and ignitors which may be electrically connected to the battery for igniting the flares. A plurality of fins of a nonmetallic material are carried by the trailing portion of the body member for stabilizing the target in towed flight, and elements are embedded within these fins to form an antenna for the radio receiver. Canted tabs on the fins cause the target to rotate as it is towed.

---

1. The claims are reproduced in the attached Appendix.

(c) The flares are a source of infrared (IR) radiation and are intended to simulate the exhaust of an aircraft engine. While the burning time for most flares is brief but adequate at high missile speeds, the invention provides for timing the combustion period by remote control to occur at a critical or controlling stage in a countermeasure procedure. Further, the patent teaches that a plurality of flares may be mounted on the target, with a sequencing switch for igniting a series of flares in succession to provide a prolonged flame period, or the flares may be ignited at selected stages. To prevent accidental or inadvertent ignition of the flares, a built-in safety system is provided which includes a normally closed switch operable by a safety pin when the tow target is on the ground. The safety system also includes a normally closed switch that opens automatically whenever the target is stored or snubbed on the towing aircraft.

3. Prior to April 1956, aerial targets available for use by various elements of the armed forces included banners, drones, rocket targets, Navy Dart targets, Redbird targets, and plaintiff's DELta targets and RADop targets.

(a) *Banners.*

Polyethylene or cloth banner targets were provided with radar reflectors for rocketry or gunnery practice and were restricted to maximum altitudes, dependent upon the towing aircraft, of about 45,000 feet and airspeeds of approximately 220 knots. They were launched by being dragged from the ground by the towing aircraft. Only short cable lengths (1,000' to 5,000') could be used with any degree of reliability. These lengths were sufficient for gunnery and rocketry but insufficient for radar-guided missiles. Banners are relatively high drag targets and are unsuitable for testing heat-seeking missiles since they cannot fly at realistic speeds and/or altitudes and have no source of IR energy.

(b) *Drones.*

Drones are pilotless aircraft, some of which were converted, obsolete airplanes

such as the F–80 and B–17. The drone B–17 (*i. e.,* QB–17) was very slow and incapable of meeting the desired test parameters for heat-seeking missiles, having a useful maximum altitude of only about 28,000 feet and a maximum speed of approximately 145 knots, *i. e.,* lower and slower than banners. Further, the QB–17 was driven by four reciprocating engines and was very expensive, having a cost in the area of $1 million each. The QF–80 drone could be flown at approximately 40,000 feet at airspeeds of .6 or .7 match. It was a jet aircraft having an original cost of up to $1 million each. Smaller drones, designated Q–2 and known as the "Ryan Fire-Bee," cost $200,000 to $300,000. Driven by a jet engine, it could be flown above 40,000 feet and at .6 or .7 mach or slightly faster. This drone originally was unsuitable, in itself, as an IR energy-emitting target for heat-seeking missiles. The use of a drone as a target required at least 100 men and four or five aircraft for each flight. A mother ship had to be in the air to control the flight of the drone; a ground control standby had to be ready in case the mother ship failed; an armed chase plane had to be in the air to shoot the drone down if it went off course; a standby chase plan had to be ready on the ground in case of failure of the chase plane; and, helicopter, boat, and/or truck crews had to be ready to recover the drone if it was not destroyed in flight.

(c) *Rockets.*

Rocket targets were also proposed, comprising small winged rockets which could be fired from an aircraft; soon after, a missile could be fired at the rocket to chase and destroy it.

(d) *Redbird.*

Redbird targets were relatively large, all metal targets carrying at one time or another, various equipment including scoring systems, radar and visual augmentation devices, radio receivers, batteries, master switches, etc. Such targets had wingspans of about 18 feet, lengths of about 18.5 feet, and heights of

about 7 feet, weighing about 270 pounds unloaded, and capable of carrying up to 500 pounds of payload. They were dragged off the runway. The evidence is unsatisfactory as to when these targets were first used with flares as an IR source.

(e) *DELta targets.*

These delta-winged targets comprised of rigid metal had a wingspan of about 16 feet and a length of about 24 feet, with average weights of 600–1,200 pounds. They were capable of carrying much complex equipment, including batteries, radios, cable releases, parachutes and parachute-deployment equipment, smoke markers, cameras, camera programmers, thermostats, camera heaters, radar corner reflectors, etc. One type of DELta target is illustrated in patent No. 2,898,058. The targets were dragged off the ground by the tow aircraft. In the area they were towed at a distance of between 1,000 and 1,500 feet behind the tow plane. The DELta targets were released from the tow cable at the end of the mission and were parachuted to the ground for possible recovery.

(f) *RADop targets.*

The early RADop targets were relatively lightweight (18–36 pounds), about 18 inches in diameter, and about 100 inches long. They were carried aloft by a tow aircraft, streamed behind the tow plane a suitable distance for gunnery or rocketry shooting, and could be recovered, in some cases, by being reeled into the tow plane. The target was provided with one or more corner reflectors for radar reflectivity. Some of the earliest designs of targets of the RADop series are described in plaintiff's patent No. 3,137,852.

Another version of the RADop target appears in patent No. 3,128,463, filed December 28, 1955. That target has a hollow, streamlined body member of an aerodynamically stable configuration, an internally mounted radar corner reflector unit, and cambered fins at the rear end thereof to produce, as the target is towed, a uniform velocity of rotation of the target about its longitudinal axis.

Patent No. 3,010,103 describes another version of the RADop target employing a number of large and small corner reflectors to provide mono-static and bistatic radar reflection.

None of the RADop targets, prior to the flare target disclosed and claimed in the patent in suit, employed, utilized, or provided a source of IR energy or any type of control or power system thereon.

Plaintiff's RADop targets were offered for sale to the Air Force in July 1955. These carried a corner radar reflector of the type shown in the patent in suit. The body of the target was radar permeable, it spun as it was towed, and it was identical in shape to the target structure shown in the patent in suit.

(g) *Navy Dart.*

In late 1953 or early 1954, the Dart target was developed by the Naval Ordnance Test Station at China Lake, California. As illustrated in patent No. 2,978,700, it was of a plywood cruciform configuration with a metal rose, measured about 12 feet long and weighed about 100–150 pounds. It employed a corner reflector for radar reflectivity. Initially, the Dart was snatch-launched and used for gunnery and rocketry system evaluations. If the target was not expended during a flight, it was parachuted to the ground and a search crew was set out to pick it up. One air launch of the target was attempted but was deemed to be unsuccessful and this method was abandoned.

By the early part of 1955, the Dart target had been used as a ground-to-air towed target for antiaircraft and guided missiles and in experimental tows for air-to-air guided missiles. In early April 1955, it was proposed to incorporate a radio link in the nose of the target to actuate smoke generators and flares on the target to aid visual identification and for tracking of the target.

On April 26, 1955, the Bureau of Aeronautics directed the Naval Ordnance

Test Station (NOTS) to institute a program for developing a suitable tow target system for guided missile development, evaluation, and training. The Dart-type target was the principal focus of the program and one objective was to develop a suitable IR source for that target. The program was classified "Confidential-Security Phase C3."

The early work under this program involved an evaluation of the target's high-speed capabilities and the use of radio-actuated smoke generators for visual aids. By July 1955, orders had been placed for radio-link receivers to use for command operation of IR-signal sources on the target. The IR sources used, as of July, included flares fired sequentially by radio command and a propane stove. Sidewinder missiles were successfully fired at these targets and both IR sources were considered to be adequate. It was also proposed to use an air-turbine-driven generator to power an electrical heating element.

By April 4, 1956, the work under this program involved an investigation of various kinds of flares and launch techniques. On April 9, 1956, NOTS advised Eglin Air Force base of the work it had been doing on flare-equipped Dart targets and described the towing techniques employed with it. The report described the work as "only limited experimental use and has not been employed at altitudes over 10,000 feet."

The documentary evidence in the record confirms that heat-seeking missiles had been fired at flare-equipped Dart targets prior to April 1956 and that the use of flares as an IR source on the Dart target had been contemplated prior to that time. The first specific mention of the use of flares as an IR source on a Dart target appears in a classified document dated July 8, 1955. References to the firing of Sidewinder missiles against Dart targets equipped with flares as an IR source are contained in documents dated July 8, 1955, April 4, 1956, April 9, 1956, and November 20, 1957, all of which were classified at the time.

The Navy's experiments with the Dart demonstrated that the flares were an adequate source of IR emissions for purposes of testing air-to-air heat-seeking missiles; however, the experiments, which continued into 1957, revealed that the aerodynamics of the Dart target were such that it could not be towed at the requisite speed and distances. In a report dated November 20, 1957, it was recommended that further work on the Dart as a target for air-to-air missiles be abandoned. This project, and the results thereof, remained classified well beyond 1956.

4. It is important that a target be towed at sufficient distances behind the towing aircraft to avoid any possibility that the missile fired at the target will, instead, lock on and hit the airplane. The distances at which the DELta targets could be towed rendered them wholly inadequate as a heat-seeking missile target. The Dart target suffered from this same defect but it was still used with heat-seeking missiles by having the tractor airplane execute a 180° turn as the firing occurred so that it was flying in a direction opposite to the target and thereby did not present an alternate IR target for the missile.

5. The June 1955 issue of Communications and Electronics Digest, a classified periodical published by the Air Force, reported the use of flares as a source of IR radiation in stationary ground tests of heat-seeking missiles. Flares were also commonly used in 1955 as photographic tracking aids. For the purpose of tracking and photographing, the Air Force employed radio-actuated flares as early as March 1954 on drone tragets at Holloman Air Force Base. As early as about October 1954, radio-actuated flares were mounted on drone aircraft used by the Navy as targets for heat-seeking missiles. These Navy drones had a plug receptacle into which was installed an arming plug prior to launch of the drone. There was also another switch that could be used to interrupt the initiating circuit for each set of flares. Sequencing switches were used

to control the order of ignition of the flares on command from the ground. The flares were used as a visual aid.

6. Neither the use of flares as a tracking technique nor the drones equipped with flares were security classified; however, the projects in which these were used were classified.

7. Prior to 1956, the use of safety switches on ordnance carried aboard aircraft was conventionally used by those skilled in the ordnance art. Safety switches were, and are, used for bombs, rockets, or any other type of ordnance. For years, almost all naval aircraft that are aboard carriers have been equipped with a safety switch which disarms or disables all ordnance. One type of switch that has been connected to the landing gear so that when the plane is resting on the gear, the switch is effective to disarm the firing circuitry. The patent of Menke et al, No. 2,880,672, discloses a safety switch where the physical movement of a droppable item on an aircraft affects the closing of a circuit thereby to arm the munition or ordnance. This switch serves to make it impossible for the ordnance to explode on the launching apparatus, for the fuse cannot be armed as long as the projectile has not traveled a given distance from the launch craft. Bianchi patent, No. 2,853,010, also shows the use of a safety switch which opens a circuit and arms a bomb mounted on the aircraft, this circuit remaining open until the bomb is released. This patent discloses a breakaway plug connected on one side and to a source of electrical energy on the other. The safety switch is disposed in a well or recess in the bomb casing and the source of electrical energy is a battery or the like carried aboard the aircraft. When the bomb is placed on the bomb rack of the aircraft and "plugged in," its fuses are electrically energized and the bomb is activated. Its fuses do not become armed, however, until the plug is disconnected upon release, when the bomb has traveled a predetermined distance from the aircraft.

In addition to the above, prior to the time the invention was made, short lanyards were in common use to actuate and arm bombs only upon release from aircraft. This is shown, for example, by the Aero 9A Ejector Bomb Rack Assembly (DX–7).

8. Notwithstanding these prior art devices, immediately prior to the time the invention was made, the Air Force was in need of a tow target that could be used to test its then-new heat-seeking missile. Col. Roy Meyers, who was in charge of searching for an adequate tow target to accomplish that purpose, testified that, after extensive research on his part, he was unable to find, in 1955 and early 1956, any system capable of simulating the high speed of jet aircraft while at the same time producing the IR emission necessary for attracting heat-seeking missiles. He further testified that the use of drones was prohibitively expensive and that it was not until plaintiff's flare-equipped tow target came on the scene that the problem was solved. Col. Meyers was not aware of the Dart work but testified that the distances at which that target could be towed would have rendered it unsuitable for Air Force use.

9: William Thornton was an officer in the United States Air Force from 1952 to 1954. His main assignment while stationed at Eglin Air Force Base was in the field of instrumentation which included problems in the instrumentation of tow targets. In 1954, he was officer in charge of the photo optics section of the range instrumentation branch. After discharge from active military service in 1954, Thornton remained on at Eglin A.F.B. until July 1955 in a Civil Service position as a physicist and consultant, in order to continue his work in the field of instrumentation.

10. In 1955, while at Eglin A.F.B., Thornton witnessed flights of drones which were completely radio-controlled and which carried a TV camera aboard to transmit to the mother ship a picture of the instruments. He also saw films taken at Holloman A.F.B. of the firing

of IR or heat-seeking missiles at the hot engine exhausts of B–17 bomber targets. He also witnessed the use of visual augmentation flares on air-to-air missiles as photographic aerial tracking aids.

11. In 1955, the Air Force funded an ad hoc committee designated Project Dollar-Wise, having the responsibility of developing a practical scheme that would reduce the cost of missile evaluation and testing. During the meeting of Project Dollar-Wise attended by Thornton in the early part of 1955, he made a sketch which showed one or more tow targets—in general form—streamed a relatively short distance behind a QF–80 drone. A dot was put on the tail of the target with radial lines around it to represent a source of radiant energy. These tow targets were to be towed by a drone which was reusable; the target itself could be destroyed. Flares were proposed as an IR source and were mounted on the trail or the target. During that session there were discussions of how to actuate such a device, including putting it through intermittent G–loads, changing altitudes, radar-actuation, etc. The committee took no action on this proposal and Thornton did nothing further with it.

12. After leaving Air Force employment, Thornton was employed at the University of North Carolina medical school in developing medical electronic instrumentation. Then, in April 1956, he agreed to work for plaintiff. While traveling to California from North Carolina, Thornton stopped at Eglin A.F.B. and spent several days there visiting friends and reacquainting himself with the state of the art and current problems in scoring systems for targets, one of the areas in which he was to work for plaintiff. While at Eglin, Thornton discussed a problem that the Air Force was experiencing in having no satisfactory system against which to test heat-seeking missiles. This problem was discussed with a representative of plaintiff, Neil Lamont, and Col. De Jarnette, USAF. It was at this meeting that Thornton conceived

the basic idea of the tow target disclosed in the Lolmaugh et al. patent. Thornton's concept included the use of flares on a high-speed, low-drag, lightweight, streamlined target which, by means of chemical energy, could release very large amounts of IR energy for short periods of time, and use of some means of triggering the flares so that the energy was available only when it was needed during the tracking phases. In essence, his idea included the use of a lightweight, high-speed, low-drag target that could be mounted on a high-performance aircraft, launching it to a distance of many miles behind the tow aircraft and recovering the target by a method such as that employed with plaintiff's early RADop targets.

13. Thornton explained his concept to Lamont, who was enthusiastic about it. Upon his arrival at plaintiff's plant in April 1956, Thornton again discussed the problem and his proposed solution. He was assigned to work under Orson B. Lolmaugh on a crash program to conduct a feasibility demonstration of a flare target system. Thornton also worked with Charles A. Smith on the program. Several freehand sketches were made during initial discussions between Thornton, Lolmaugh, and Smith to determine that the concept could be employed, and of suitable hardware. Since plaintiff already had a basic target body in its early RADop series, as well as a tow-reel system capable of streaming targets a considerable distance behind a tow aircraft, Thornton, Lolmaugh, and Smith proposed to utilize these existing devices to demonstrate a flare target at the lowest possible cost and in the least possible time. They recommended that actual work be undertaken and a job authorization was issued on May 3, 1956, so work could begin on the first prototype.

14. Under the direction of Thornton and Lolmaugh, Smith produced the first formal drawing, illustrating the features of an assembled flare target as proposed on May 4, 1956. The three inventors then undertook work to design and/or

procure suitable equipment including radios, batteries, escapement-switching devices, flares, etc. These elements were then mounted in an early-series RADop target to produce a flare target of the type illustrated and described in the patent in suit. Within a matter of weeks, a flare target had been prepared by plaintiff and it was then mounted on a Cessna aircraft, using an already available Del Mar launcher and tow reel. The aircraft was then flown offshore at Él Segundo, California, with Lolmaugh serving as the tow-reel operator in the plane. With the target streamed behind the aircraft, the flares were ignited one at a time by Thornton via radio command from the beach. Thereafter, the target was recovered. The initial flight test having been completed, detailed drawings were prepared and several additional flight tests were conducted to experiment with and select suitable flare-mounting structures and arrangements as well as to test various flare-firing combinations. These tests indicated that the target configuration was not optimum because the flares disturbed the airflow over the target and that parasitic ignition of the flares could occur. As a result of subsequent work by plaintiff, and some tests later conducted by the Air Force, the target was refined and modified to its final commercial form. That form has the same basic body shape as that disclosed in the patent and includes fins, radio equipment, power supply, stepping relay, flares, and radar equipment, all as disclosed in the patent in suit.

15. On August 17, 1956, the Air Force, through its Base Procurement Office at Eglin A.F.B., entered into supply contract No. AF 08(603)–3163 with plaintiff, to purchase various items including ten targets of the type disclosed in the patent in suit. Upon delivery of some of the targets, a T–33 aircraft was used for streaming at least one of the flare targets on several flights; another T–33 was used for photographing the streaming and flare ignition on at least one of the flights. As a result of these accept-ance flights, the targets were accepted and the remaining targets were delivered to the Air Force.

16. Substantial quantities of these targets have been sold both to the United States and to foreign governments. Subsequent to plaintiff's development, others in the field have developed tow targets of a similar construction using radio-actuated flares as an IR source, including those accused to infringe. The TDU–6/B target procured by defendant has a configuration similar to that of the RADop target, while the TDU–9%B target is similar in shape to the Dart target. Others of the targets procured by defendant have no physical resemblance to either the RADop or the Dart; however, they are all towed targets with radar reflectivity (active or passive) and radio-actuated flares.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

## APPENDIX

1. An aerial tow target comprising a hollow thin-walled rigid body member having a low drag aerodynamic configuration, the walls of said body member being formed of a nonmetallic material permeable by radar waves; means defining a plurality of normally intersecting planes interiorly of said body member and having a metallic surface for reflecting exteriorly propagated radar waves; a rearwardly directed flare magazine mounted to the trailing end of said body member; a plurality of rearwardly directed flares mounted in said magazine; a radio receiver carried within said body member, said radio receiver developing an output signal in response to a received signal from a remote source; and means for igniting said flares in sequence, including means responsible to an output signal of the radio receiver,

whereby said flares are ignited in response to the received signal from the remote source.

2. An aerial tow target comprising a hollow thin-walled rigid body member having a low drag aerodynamic configuration, the walls of said body member being formed of a nonmetallic material permeable by radar waves, means defining a plurality of normally intersecting planes interiorly of said body member and having a metallic surface for reflecting exteriorly propagated radar waves, a rearwardly directed flare magazine in the trailing end of said body member; a plurality of rearwardly directed flares mounted in said magazine; a radio receiver carried within said body member, said radio receiver developing an output signal in response to a received signal from a remote source; means for igniting said flares in sequence including means responsive to said output signal of the radio receiver whereby said flares are ignited in response to the received signal from the remote source; a plurality of fin elements carried by the trailing portion of said body member for stabilizing the same in towed flight; said fins being formed of a nonmetallic material; and elements embedded within said fin elements forming an antenna for said radio receiver.

3. An aerial tow target for practice in the detection of self-propelled aerial objects, comprising: a streamlined body; means carried by the leading end of said body for connection to a tow cable whereby said target may be towed by an aircraft to which said cable is affixed; a rearwardly directed flare holder mounted to the trailing end portion of said streamlined body; at least one rearwardly directed flare mounted in said holder; a radio receiver carried within the body of the tow target, said radio receiver developing an output signal in response to a signal received from a remote signal-generating source; and means for igniting said flare, including means responsive to said output signal of the radio receiver, whereby said flare is ignited in response to the received signal from the remote signal-generating source during the tow of the target.

4. An aerial tow target, comprising: an elongate, streamlined body member for connection to a tow cable for tow by an aircraft to which said cable is affixed; a rearwardly directed flare holder mounted to the trailing end of said body member; a rearwardly directed flare mounted in said holder; a radio receiver carried within said body member, said radio receiver responsive to a received signal from a remote source for developing an output signal; an electromotive source carried by said body member; electro-responsive means carried within said body member for igniting said flare; and means responsive to the output signal of said radio receiver for electrically coupling said electromotive source to said electro-responsive ignition means for actuation of the same, thereby to ignite said flares in response to the received signal from the remote source.

5. An aerial tow target for practice in the detection of self-propelled aerial objects, comprising: a streamlined body for connection to a tow cable; at least one charge of rapidly combustible material carried by said body to create a highly visible flame; remotely controlled ignition means on said body to ignite said charge; means for supporting said body on an aircraft for transportation to a practice area; and safety means to make said ignition means inoperative in response to engagement of the body by said supporting means.

6. An aerial tow target for practice in the detection of self-propelled aerial objects, comprising: a streamlined body for connection to a tow cable; at least one charge of rapidly combustible material carried by said body to create a highly visible flame; a radio receiver carried by said body; an electromotive source carried by said body; electrical means to ignite said charge; means responsive to said radio receiver to place said source in electrical communication with said ignition means; means for sup-

porting said body on an aircraft for transportation to a practice area; and safety switch means responsive to engagement of the body by said supporting means to render said igniting means inoperative.

7. An aerial tow target for practice in the detection of self-propelled aerial objects, comprising: a streamlined body for connection to a tow cable; at least one charge of rapidly combustible material carried by said body to create a highly visible flame; a radio receiver carried by said body; an electromotive source carried by said body; electrical means to ignite said charge; means responsive to said radio receiver to place said source in electrical communication with said ignition means; safety switch means to make said igniting means inoperative when the tow target is on the ground; and a safety operating member for insertion into said body to actuate said safety switch means.